# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# LAFAYETTE DIVISION

| | |
|---|---|
| Lebrun | Civil Action No. 15-01828 |
| versus | Magistrate Judge Carol B. Whitehurst |
| Baker Hughes Inc et al | By Consent of the Parties |

## MEMORANDUM RULING

Before the Court is a Motion for Summary Judgment filed by Defendant, Transocean Offshore Deepwater Drilling, Inc. ("Transocean") [Rec. Doc. 83] and Transocean's Supplemental Memorandum in Support, [Rec. Doc. 127], Plaintiff, Jonathan Lebrun's, Memorandum in Opposition [Rec. Doc. 92] and Plaintiff's Supplemental Memorandum in Opposition [Rec. Doc. 126]. For the reasons that follow, the Motion will be granted.

### *I. Background*

Plaintiff, Jonathan Lebrun, worked for Baker Hughes Oilfield Operations, Inc. ("BHOOI") from December 2005 until April 24, 2015. According to Karen Johnson, a Risk Management Analyst II for Transocean, Plaintiff was assigned to work aboard Transocean's drillship, DEEPWATER CHAMPION, for eighty-one (81) days in 2013 through 2014. *R. 83-7, Decl. Of Johnson.* His last hitch was from March 13, 2015 until April 24, 2015. Johnson further states that Plaintiff worked a total of 104

days on the DEEPWATER CHAMPION. *Id.*

Plaintiff alleges that while he was aboard the DEEPWATER CHAMPION he collected geological samples from the drilling mud returns inside an enclosed "shaker shack" located above the main deck.[1] He further alleges that, as part of his duties as a mud sampler, he had to enter and exit the shaker shack via the room's "vacuum sealed, 1/4 inch steel blast-proof shaker house door" multiple times per day. Plaintiff contends he injured his lower back by having to repeatedly pry open the shaker house door using his foot against the wall during his 12-hour shifts.[2]

Plaintiff was terminated by Baker Hughes on April 24, 2015, due to a company-wide Reduction in Force caused by the downturn in the oilfield in 2014-2015. *R. 83-8, Decl of Guidry*. Plaintiff filed this action alleging claims under the Jones Act. *R. 1*. On June 14, 2016, this Court found that Plaintiff was not a Jones Act seaman. *R. 44*. In his Second Amended Complaint, Plaintiff alleged a claim for unseaworthiness as a Sieracki seaman as well as for negligence and gross negligence under the general maritime law; alternatively, Plaintiff alleged his action arises under the Longshore and Harbor Workers Compensation Act ("LHWCA") and the general

---

[1] Plaintiff's job duties were to collect mud samples from shale shakers and deliver the mud samples to on-site data engineers and geologists for analysis. *R. 44*.

[2] The record provides that Plaintiff underwent surgery on May 18, 2015, in which his neurological surgeon performed a lumbar laminectomy. *R. 80-7, Exh. 22*.

2

maritime law. *R. 56.* On August 18, 2017, the Court denied Plaintiff's Motion for Summary Judgment for Sieracki Seaman status. *R. 109.* Thus, as a Longshoreman, Plaintiff retained a negligence claim against Transocean, the operator of the DEEPWATER CHAMPION.

In its Motion for Summary Judgment, Transocean seeks dismissal of Plaintiff's negligence action with prejudice, at plaintiff's costs. Transocean contends that it had no "turnover duty" to Plaintiff related to the condition of the shaker shack door that Plaintiff alleged caused his back injury because the door was an "open and obvious" condition which is not encompassed in the "turnover duty." Plaintiff filed an Opposition Memorandum reiterating that his back injury was caused by Transocean's negligence based on the vacuum seal on the shaker shack door.

On October 18, 2017, the Court conducted a hearing with oral argument on the Motion.[3] During the hearing, for the first time, counsel for Plaintiff argued there was no issue of "turnover duty' in this case because Plaintiff had no control over any aspect of the DEEPWATER CHAMPION; he worked in the shaker shack with

---

[3] The parties consented to the undersigned Magistrate Judge on August 24, 2017. Plaintiff filed its Opposition Memorandum to Transocean's Motion at issue four (4) days after consenting to this Court. *R. 92.* At that time, Plaintiff's Motion for Summary Judgment as to Sieracki Seaman status and Transocean's Opposition, both filed in December, 2016, remained pending. *R. 59; 61.* The Court denied Plaintiff's Motion as to Sieracki Seaman on September 18, 2017. *R. 108; 109.* Because a large portion of Plaintiff's Opposition Memorandum was directed toward his Sieracki Seaman argument, the Court conducted the hearing with oral argument.

3

Transocean shaker hands; and, Transocean never gave up any responsibility over the shaker shack. *Unofficial Hearing Transcript, 10/18/2017.* Rather, Plaintiff argued that the real issue in this case is whether or not Transocean breached the "active control" duty by maintaining control over the venting system and thereby control of the vacuum door through which Plaintiff had to enter and exit the shaker shack. *Id.* Plaintiff conceded that there was no question that the door was an open and obvious condition, but argued, presumably in the alternative, that the "no alternative" exception to the open and obvious condition excluded any such issue. *Id.* Following conclusion of the arguments, the Court ordered the parties to separately file Supplemental Memoranda related to Plaintiff's argument as to the "no alternative" exception and Transocean's "active control" duty. The parties complied with the Court's order. *R. 126, 127.*

## II. *Summary Judgment Standard*

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Under Rule 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see Stahl v. Novartis Pharms. Corp.*, 283 F.3d

254, 263 (5th Cir.2002). The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact but need not negate the elements of the nonmovant's case. *Exxon Corp. v. Oxxford Clothes XX, Inc.*, 109 F.3d 1070, 1074 (5th Cir.1997). When the moving party, has met its Rule 56(c) burden, the nonmoving party, cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. "[T]he nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir.2004).

*III. Legal Analysis*

Section 905(b) of the LHWCA grants covered maritime workers an exclusive remedy against a "vessel" for injuries caused by the vessel's negligence. *See* 33 U.S.C. § 905(b). The Act defines "vessel" broadly to include both the physical vessel on which the worker was injured and "said vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member." 33 U.S.C. § 902(21). As the operator of the DEEPWATER CHAMPION, Transocean moves the Court to find that there is no genuine dispute as to any material fact that Transocean's negligence did not substantially cause and/or contribute to Plaintiff's lumbar injuries and resulting surgery.

In *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156 (1981), the U.S. Supreme Court articulated the scope of a vessel's duties to longshoremen and harbor workers under § 905(b). The *Scindia* Court explained that a stevedore was required to provide "a reasonably safe" place to work and to take such safeguards with respect to equipment and working conditions as necessary to avoid injury to longshoremen, but the ship owes no such duty to them, and a vessel may rightfully expect that a stevedore would perform his task properly without supervision by the ship. *Id.* at 170. Transocean also relies on *Helaire v. Mobil Oil Co.*, 709 F.2d 1031, 1036 (5th Cir.1983), in which the Fifth Circuit stated that "[t]he most basic principle which emerges from Scindia is that the primary responsibility for the safety of the longshoremen rests upon the stevedore." Therefore, Transocean argues that the Supreme Court and the Fifth Circuit have consistently recognized that the responsibility for the safety of a maritime worker lies with the employer, such as Baker Hughes, and not the vessel operator, in this case Transocean.

Nonetheless, the Supreme Court has outlined three general duties that vessel owners/operators owe to covered workers under section 905(b):

> The first, which courts have come to call the "turnover duty," relates to the condition of the ship upon the commencement of stevedoring operations. The second duty, applicable once stevedoring operations have begun, provides that a shipowner must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the "active control of the vessel." The third duty, called the "duty to intervene,"

6

> concerns the vessel's obligations with regard to cargo operations in areas under the principal control of the independent stevedore.

*Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 98 (1994). Although the principal cases discussing these duties arose in the context of stevedoring operations, the Fifth Circuit has held that the rationale of those cases "clearly applies to any independent contractor and its harborworker employees covered by the LHWCA and working aboard ship." *Hill v. Texaco, Inc.*, 674 F.2d 447, 451 (5th Cir.1982).

In its Motion, Transocean asserts that Plaintiff cannot prove Transocean breached its "turnover duty" because the condition of the shaker shack door at issue was open and obvious to Plaintiff and his co-workers.

*A. Turnover Duty*

A vessel owner has two distinct duties relating to the condition of the vessel at the time it is turned over to the stevedore. First, the vessel owner must "exercise ordinary care under the circumstances" to ensure that the vessel and its equipment are "in such condition that an expert stevedore can carry on stevedoring operations with reasonable safety." *Kirksey v. Tonghai Maritime*, 535 F.3d 388, 392 (5th Cir.2008). Second, "the owner owes a duty to warn the stevedore of latent or hidden dangers which are known to the vessel owner or should have been known to it...." *Id*. Neither duty encompasses dangers: "(1) [that are] open and obvious or (2) [that] a reasonably competent stevedore should anticipate encountering." *Id*.

Plaintiff alleges he was injured by the repetitive opening of the vacuum sealed shaker shack door on the DEEPWATER CHAMPION, a requirement of his job as a mud sampler. Transocean contends it can only be held liable for negligence if the injury-causing condition was latent or hidden, and not one that a reasonably competent longshoreman such as Plaintiff should expect to encounter. Transocean asserts that Plaintiff's allegations that the shaker shack door was the mechanism of his injury, was neither a latent nor hidden condition, but rather encompassed dangers that were open and obvious that Plaintiff should have anticipated. Transocean cites the depositions and declarations of Plaintiff as well as his co-workers on the DEEPWATER CHAMPION, contending that the facts are not in dispute as to Plaintiff's competence and knowledge of the condition of the door at issue.

First, citing the deposition of Plaintiff's co-workers, Matt McDonald and Jessica Raines, Transocean contends that while both of these individuals were "smaller" than Plaintiff[4] and they opened the door on a regular basis and/or as many times as Plaintiff, neither was injured opening the door. *R. 83-4; 83-5.* Plaintiff conceded in his deposition that he had worked at least one hundred and eighteen (118) days since 2010 on other drilling rigs which were configured with an enclosed shaker room vented via

---

[4] It is undisputed that Plaintiff was 6"4' and 280 pounds. Transocean describes McDonald as a "much smaller man" and Raines as a "whisper-thin woman." *R. 83-2.*

a vacuum system. *R. 83-11, Supp. Depo of LeBrun, pp. 13-16; 83-10.*

Transocean also cites the "START Cards" which it encouraged all workers aboard the rig to identify, report and mitigate safety hazards. *R. 83-7.* The record indicates that Plaintiff regularly reported various minor safety concerns and then reported those concerns were satisfactorily addressed and resolved. *Id., pp.2-93.* None of the forty-six (46) Start Cards Plaintiff completed while on his final hitch aboard the DEEPWATER CHAMPION made any mention of the shaker room door. Moreover, Transocean asserts, no one aboard the DEEPWATER CHAMPION from the first year of operation until the present, ever reported being injured by the shaker room door. *Id., pp. 94-95.*

Transocean contends Plaintiff cannot reasonably argue that he was incapable of avoiding the alleged hazard when he and others had successfully avoided it for at least 81 days prior to his injury; Nor can Plaintiff reasonably argue that he couldn't safely operate the door when he and others had done so thousands of times before his alleged injury. Finally, Transocean contends that Plaintiff never reported concerns related to the safety of the shaker shack door or any alleged injury caused by it. Transocean argues that because the door at issue was open and obvious and Plaintiff was fully aware of it, there is no duty upon Transocean as the operator of the vessel in this case.

In his Opposition Memorandum, Plaintiff focuses on disputing Transocean's statement in its Memorandum that it "had an impeccable safety culture." *R. 83-2, p. 7.* Plaintiff cites the United States Coast Guard's Report of Investigation in the Circumstances Surrounding the Explosion, Fire Sinking, and the Loss of Eleven Crew Members Aboard the MOBILE OFFSHORE DRILLING UNIT DEEPWATER HORIZON. *R. 79-4.* He contends that the document provides that maintenance deficiencies were found on the "DEEPWATER HORIZON *and other vessels*" including that "Watertight doors were inoperable" and "Watertight hatches needed replacement." *Id.* He asserts that the document demonstrates that Transocean had a history of poor maintenance on its vessels. Plaintiff, however, provides nothing to support that the Report applies in any way to the DEEPWATER CHAMPION.

Plaintiff next contends that contrary to Transocean's contentions, his co-workers confirmed that the shaker door was difficult to open and often could not be opened at all. Plaintiff's co-worker, Jamison Lookofsky stated in her deposition,

> Q. Did it ever come to your attention that the doors leading to the shaker shack could be difficult to open due to a vacuum created by the venting or purging of gases
> A. Yes.
> Q. How did that come to your attention?
> A. If I had to go out there and get into the shaker house or if any of the sample catchers were to come in and say that the purge is too much on the door and they can't get in.
> Q. They could not get in at all?
> A. Right.

> Q. How many times did that happen?
> A. In a week? In a day? Like -- it was rare --it's rarely a daily event, but it's often times maybe once or twice a week, they would have the purge pretty high. And there's also -- it also depends on what we're doing as far as rig operations go.

*R. 83-9, p. 22*. In his deposition, co-worker Jacob Godin stated that it wasn't hard for him to open the shaker door because he works out, Jessica Raines "had a hard time with it." Godin explained that he had watched "her try to open it and she was just having a hard time, so I would just do it for her." *R. 80-5, pp. 12-13*. Jared Martin, Transocean's drilling superintendent acknowledged that he knew the shaker shack venting system made opening the door difficult. *R. 80-7, Exh. 19, p.39*. He also confirmed that at times the door could not be opened at all. *Id. at pp 40-41*. Martin stated that if the shaker shack door was inoperable, a worker could tell the Transocean "shaker hand" who in turn would call the driller - who would then call the vessel's bridge to dial down the venting system. *Id.*

During the October 18, 2017 hearing on oral argument and in his Supplemental Memorandum in Opposition to the instant motion, *R. 126*, Plaintiff contends that despite Transocean's argument, the "turnover duty" is not at issue because "Plaintiff never assumed custody or control over the shaker shack. Transocean never 'turned over' the shaker shack to Plaintiff or his co-workers." *R. 125, p. 3*. Plaintiff concedes that the shaker shack door is an open and obvious condition and is excluded under the

turnover duty. Despite the above contentions/concessions, Plaintiff argues that even if the open and obvious defense is applicable, the "no alternative" exception applies to exclude the defense.

*1. No Alternative Exception*

The Fifth Circuit has "long held that when an independent contractor has actual knowledge of a remediable hazardous condition[,] the vessel owner's turnover duty is not implicated unless the contractor's 'only alternatives would be to leave his job or face trouble for delaying work.'" *Manuel v. Cameron Offshore Boats, Inc*., 103 F.3d 31, 34 (5th Cir.1997). Plaintiff agrees that "the inoperable condition of the shaker shack vacuum sealed door was open and obvious," but argues that he had no alternative to "wrestling" with the door other than quitting his job.

Plaintiff made no allegation related to the "no alternative" exception in his Complaint, and the Court has found no evidence in the record to suggest that Plaintiff had no alternative to a problem opening the door other than quit. Nor is there any evidence that Plaintiff, or any co-worker, faced trouble for delaying work because of any instance involving the shaker shack door. In fact, Plaintiff has admitted that he and other BHOOI employees routinely asked co-workers for assistance in opening the door and/or that the vacuum system be turned down temporarily in order to relieve the pressure on the door to make it easier to open. While Plaintiff suggests the available

alternative of turning down the vacuum system was so complex and convoluted that it was an "unduly impracticable or time-consuming alternative," the record indicates that Transocean had no issues with such a request from any BHOOI worker. *R. 80-7, Depo. Of Martin, Exh. 19, pp. 40-41*.

The Court has considered all of the evidence and the parties' memoranda and applicable jurisprudence, in particular Plaintiff's Supplemental Memorandum conceding that the "turnover duty" does not apply in this case. The Court finds there are no genuine issues in dispute that Transocean did not breach its turnover duty. But even assuming *arguendo* that the duty does apply, the Court finds it is undisputed that the condition of the shaker shack door was open and obvious and the "no alternative" exception does not apply in this case.

B. *Active Control Duty*

In his Supplemental Memorandum, Plaintiff also asserted that Transocean's duty to Plaintiff was under the "active control" duty. Under this duty, a vessel owner may be liable if it actively involves itself in the contractor's operations and negligently injures an employee, or fails to exercise due care to protect the contractor and its employees from hazards in the areas of the vessel still under the owner's control. *Fontenot v. McCall's Boat Rentals, Inc.*, 227 Fed.Appx. 397, 403, (5th Cir. 2007) "[T]he owner has no general duty by way of supervision or inspection to discover

dangerous conditions that develop in the area assigned to the stevedore." *Helaire v. Mobile Oil Corp.*, 709 F .2d 1031, 1036 (5th Cir.1983) But a vessel owner may be liable if it fails "to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." *Pimental v. LTD Canadian Pac. Bul*, 965 F.2d 13, 16 (5th Cir.1992).

"To determine whether a vessel owner retains active control over a contractor's work, courts consider "whether the area in question is within the contractor's work area, whether the work area has been turned over to the contractor, and whether the vessel owner controls the methods and operative details of the stevedore's work." *Hudson v. Schlumberger Tech. Corp.*, 452 F. App'x 528, 532–33 (5th Cir.2011) (quoting *Dow v. Oldendorff Carriers GMBH & Co.*, 387 Fed. App'x 504, 507 (5th Cir.2010)). "[A]lthough a vessel owner no longer retains the primary responsibility for safety in a work area turned over to an independent contractor, no such cession results as relates to areas or equipment over which the vessel's crew retains operational control." *Manuel v. Cameron Offshore Boats, Inc.*, 103 F.3d 31, 34 (5th Cir.1997).

Transocean asserts that it "did not in any way direct or control the manner in which the plaintiff performed his job duties, nor ... have any supervisory authority of the plaintiff or any of his co-workers in the shaker room." *R. 127, p.* Neither

Transocean's motion nor its Supplemental Memorandum address the "active control" duty raised by Plaintiff in oral argument and in his Supplemental Memoranda. Plaintiff never alleges in his Complaint that Transocean breached the "turnover duty." Rather Plaintiff broadly contends that his "injuries stemmed from the negligence of ... Transocean." *R. 1, ¶ 12*. It is axiomatic that a summary judgment may be rendered or affirmed only as to those issues set forth in the motion under consideration by the court at that time. Accordingly, the Court will grant Transocean's Motion as to the "turnover duty" but will not dismiss this case in light of Plaintiff's assertion that Transocean breached the "active control" duty.

*IV. Conclusion*

Based on the foregoing Transocean Offshore Deepwater Drilling, Inc.'s Motion For Summary Judgment [Rec. Doc. 83] will be **GRANTED**.

THUS DONE AND SIGNED this 14th day of November, 2017, at Lafayette, Louisiana.

_____
**CAROL B. WHITEHURST**
**UNITED STATES MAGISTRATE JUDGE**